2016 IL 119181

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 119181)

JEFFREY W. VAUGHN, Appellee, v. THE CITY OF CARBONDALE,
Appellant.

Opinion filed March 24, 2016.

_____

JUSTICE THOMAS delivered the judgment of the court, with opinion.

Chief Justice Garman and Justices Freeman, Kilbride, Karmeier, Burke, and
Theis concurred in the judgment and opinion.

## OPINION

¶ 1       At issue in this case is whether defendant, the city of Carbondale, Illinois, is
obligated to continue to pay the entire premium of its health insurance plan for
plaintiff, Jeffrey W. Vaughn, and his family, pursuant to section 10 of the Public
Safety Employee Benefits Act (Act) (820 ILCS 320/10 (West 2012)). The circuit
court of Jackson County denied plaintiff's complaint for injunctive relief, which
sought to prevent defendant from terminating plaintiff's section 10 health insurance
coverage. The Appellate Court, Fifth District, reversed. 2015 IL App (5th) 140122.
This court allowed defendant's petition for leave to appeal. Ill. S. Ct. R. 315(a) (eff.
Jan. 1, 2015). For the reasons that follow, we reverse the appellate court.

BACKGROUND

¶ 3          Because this case has a lengthy history leading to the instant action, some of which overlaps with this case, we will set forth the background in some detail. On June 28, 2005, plaintiff was employed as a police officer for defendant's police department. Plaintiff was on duty that morning, driving his patrol car in the University Mall parking lot. A motorist stopped plaintiff and asked him for directions, so plaintiff parked his patrol car by the curb of an island in the parking lot and went over to talk to the motorist. Plaintiff left the driver's side door of his vehicle open. While plaintiff was outside his patrol car talking to the motorist, a Carbondale police department dispatcher called for plaintiff to respond over the radio. Plaintiff had a portable radio on his uniform when he received the call from dispatch, but the portable radio was turned off. Plaintiff returned to his patrol car to answer the call, reaching headfirst through the driver's side door in order to reach the microphone. As plaintiff was reaching inside the vehicle, he struck the top of his head on the door frame, causing him to "see stars" and experience a sharp pain in his arm. Plaintiff did not sustain an abrasion or blood loss.

¶ 4          Plaintiff reported the incident to his shift supervisor. The next day, plaintiff went to see his primary care physician. Plaintiff was off work from June 28, 2005, to July 4, 2005. On July 19, 2005, plaintiff returned to his primary care physician because his left arm and back were giving him pain. An MRI showed a compression fracture of plaintiff's T1-T3 vertebrae. Plaintiff never returned to work with the police department following his second appointment with his primary care physician.

¶ 5          On April 11, 2007, plaintiff filed an application with the Carbondale Police Pension Board (Board) for a line-of-duty disability pension under section 3-114.1 of the Illinois Pension Code (40 ILCS 5/3-114.1 (West 2008)). The Board found that plaintiff's disability was not the result of an on-duty injury and also found that plaintiff was not disabled to the extent that he was unable to return to work as a patrol officer.

¶ 6          Plaintiff then filed a complaint for administrative review, and the circuit court of Jackson County reversed the Board's decisions. The appellate court affirmed the circuit court. *Vaughn v. Carbondale Police Pension Board*, No. 5-10-0293 (2011) (unpublished order under Supreme Court Rule 23).

¶ 7    On January 26, 2012, plaintiff sent defendant a letter requesting that defendant provide plaintiff with health insurance coverage in accordance with section 10 of the Act. Defendant thereafter began providing plaintiff and his family with health insurance coverage.

¶ 8    Also in 2012, the Board directed plaintiff to submit to a physical examination, as required by the Illinois Pension Code. See 40 ILCS 5/3-115, 3-116 (West 2012). Plaintiff was examined by Dr. Jeffrey Ripperda in May 2012. Following his examination of plaintiff, Dr. Ripperda concluded that plaintiff was physically able to return to work as a police officer. Dr. Ripperda submitted his findings to the Board.

¶ 9    On June 26, 2012, at a previously scheduled meeting, the Board discussed whether plaintiff's disability pension should be terminated. The Board voted to accept Dr. Ripperda's report and to terminate plaintiff's disability pension in light of Dr. Ripperda's reported findings. On or about July 9, 2012, the Board notified plaintiff by letter that it had voted to terminate plaintiff's pension benefits effective June 26, 2012.

¶ 10   On August 3, 2012, plaintiff filed a petition for rehearing with the Board, alleging that he had a meritorious defense to the termination of his pension benefits, and that he had not received notice of the meeting where the Board had voted to terminate his pension benefits. On August 7, 2012, plaintiff also filed a complaint for administrative review of the Board's decision in the circuit court of Jackson County. On August 31, 2012, the Board sent plaintiff's counsel a letter advising that the Board had voted to deny plaintiff's petition for rehearing.

¶ 11   Thereafter, on June 14, 2013, the circuit court affirmed the Board's decision to terminate plaintiff's pension benefits, holding that the Board's finding that the plaintiff was no longer disabled was not against the manifest weight of the evidence. Plaintiff filed a motion to reconsider in the circuit court, noting that the circuit court's decision did not address plaintiff's claim that the Board had denied him procedural due process when it failed to give him adequate notice of the meeting at which his benefits were terminated. The circuit court denied plaintiff's motion to reconsider on August 28, 2013.

¶ 12   Plaintiff then filed an appeal of the Board's decision terminating his pension benefits. The appellate court reversed the circuit court in an order entered on June 30, 2014, finding that the Board had violated plaintiff's due process rights by

unilaterally voting to terminate plaintiff's disability pension without notice or a proper hearing. *Vaughn v. Carbondale Police Pension Board*, 2014 IL App (5th) 130457-U. The appellate court did not address whether the Board's determination that plaintiff was no longer disabled was against the manifest weight of the evidence.

¶ 13    Relevant to the instant appeal, following the Board's finding that plaintiff was no longer disabled, defendant sent plaintiff a letter dated July 17, 2012, notifying him that his coverage under the defendant's group health benefit plan would end on August 31, 2012, and informing him of his rights and obligations regarding continuation of group health coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) (29 U.S.C. § 1161 *et seq.* (2012)).

¶ 14    On September 4, 2012, plaintiff filed a complaint for injunctive relief in the circuit court of Jackson County, asking the court to preserve his right to health insurance coverage under section 10 of the Act. The circuit court entered an order granting plaintiff's petition for preliminary injunction on September 17, 2012. However, on February 21, 2014, while the appeal of the circuit court's order affirming the termination of plaintiff's pension benefits was pending, the circuit court entered an order dissolving the preliminary injunction and denying plaintiff's request for a permanent injunction.

¶ 15    In its order denying the complaint for injunctive relief, the circuit court noted that plaintiff asserted he was entitled to insurance coverage for life under section 10 of the Act, and that he began receiving insurance benefits based upon a letter sent to defendant citing the Act. In response, defendant submitted an affidavit denying that it had provided insurance pursuant to the Act. Defendant's affidavit claimed that insurance was provided pursuant to plaintiff's disability pension.

¶ 16    The circuit court then observed that in order to be covered by section 10 of the Act, a police officer must meet two requirements. First, the officer must suffer a catastrophic injury in the line of duty. Second, the injury must have occurred as a result of the officer's response to a fresh pursuit, a response to what is reasonably believed to be an emergency, in response to an unlawful act perpetrated by another, or during the investigation of a criminal act. The circuit court held that plaintiff could not establish a clear and palpable right to insurance coverage because he could not meet the first requirement of section 10: a catastrophic injury in the line of duty. The circuit court stated that plaintiff's injury could not be catastrophic,

- 4 -

given the Board's finding that plaintiff was able to return to work. The circuit court found that even if plaintiff's insurance benefits had been provided under the Act, it did not follow that plaintiff and his family were entitled to continued benefits under the Act, in light of the fact that plaintiff had been found to have recovered from his disability.

¶ 17 Plaintiff appealed the circuit court's decision denying his complaint for injunctive relief. The appellate court reversed the circuit court. 2015 IL App (5th) 140122. In reversing the circuit court, the appellate court first noted that the circuit court's reason for denying health insurance benefits under the Act was no longer applicable. *Id.* ¶ 10. The circuit court had reasoned that, given the Board's termination of plaintiff's line-of-duty pension benefits on the ground that plaintiff had recovered from his disability, plaintiff had not suffered a catastrophic injury for purposes of section 10. However, the appellate court in the termination of benefits appeal had since reversed that decision and had reinstated plaintiff's line-of-duty pension benefits, finding that plaintiff had been denied procedural due process.

¶ 18 Because plaintiff's line-of-duty pension benefits had been reinstated, the appellate court in this case looked to the decisions in *Krohe v. City of Bloomington*, 204 Ill. 2d 392 (2003), and *Nowak v. City of Country Club Hills*, 2011 IL 111838, where the courts held that a "catastrophic injury" as used in section 10 of the Act was synonymous with an injury resulting in the awarding of a line-of-duty disability pension under section 4-110 of the Illinois Pension Code (40 ILCS 5/4-110 (West 2012)). 2015 IL App (5th) 140122, ¶¶ 9, 10. Based upon those decisions, plaintiff had suffered a catastrophic injury within the meaning of section 10(a) of the Act because he currently was receiving a line-of-duty disability pension under section 4-110 of the Illinois Pension Code. *Id.* ¶ 10.

¶ 19 The appellate court next held that plaintiff's work-related injury occurred as a result of his response to what he reasonably believed was an emergency, one of the circumstances set forth in section 10(b) of the Act. *Id.* ¶ 12. Plaintiff, therefore, met the requirements of section 10 of the Act, and was entitled to the health benefits therein. Accordingly, the appellate court reversed the circuit court's judgment and remanded for further proceedings consistent with its decision.

¶ 20                                    ANALYSIS

¶ 21        Our analysis in this case is governed by section 10 of the Act. That statute provides, in relevant part:

> "(a) An employer who employs a full-time law enforcement, correctional or correctional probation officer, or firefighter, who, on or after the effective date of this Act suffers a catastrophic injury *** shall pay the entire premium of the employer's health insurance plan for the injured employee, the injured employee's spouse, and for each dependent child of the injured employee ***. ***
>
> (b) In order for the law enforcement, correctional or correctional probation officer, firefighter, spouse, or dependent children to be eligible for insurance coverage under this Act, the injury or death must have occurred as the result of the officer's response to fresh pursuit, the officer or firefighter's response to what is reasonably believed to be an emergency, an unlawful act perpetrated by another, or during the investigation of a criminal act." 820 ILCS 320/10 (West 2012).

¶ 22        As noted, the instant case arose from plaintiff's appeal of the circuit court's order denying his complaint for injunctive relief. Generally, a reviewing court will not overturn a trial court's order concerning a permanent injunction unless that order is against the manifest weight of the evidence. *Swigert v. Gillespie*, 2012 IL App (4th) 120043, ¶ 28. However, when the appeal of an order granting or denying a permanent injunction involves a question of law, the standard of review is *de novo*. *Id.*

¶ 23        The issue in this case is whether, under the facts of the case, plaintiff was entitled to benefits under section 10 of the Act. Accordingly, because the appeal involves a question of fact, the standard of review is whether the trial court's order was against the manifest weight of the evidence. A judgment is against the manifest weight of the evidence only when the findings appear to be unreasonable, arbitrary, or not based on evidence, or when an opposite conclusion is apparent. *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 106 (1995).

¶ 24        In this court, defendant does not dispute that plaintiff suffered a catastrophic injury for purposes of section 10(a) in this case. As the court recently reiterated, "a pension board's award of a line-of-duty disability pension establishes that the

public safety employee suffered a catastrophic injury as required by section 10(a) of the Act." *Village of Vernon Hills v. Heelan*, 2015 IL 118170, ¶ 25.

¶ 25     Defendant, however, notes that section 10 not only requires a catastrophic injury, but also provides that the injury must have occurred in one of the four situations specified in section 10(b) of the Act. The parties agree that plaintiff's injury did not occur in response to fresh pursuit, an unlawful act perpetrated by another, or during the investigation of a criminal act. Therefore, the only applicable situation is if plaintiff's injury occurred in response to what is reasonably believed to be an emergency.

¶ 26     The court in *Gaffney v. Board of Trustees of the Orland Fire Protection District*, 2012 IL 110012, addressed the meaning of the term emergency for purposes of section 10(b). *Gaffney* involved two consolidated cases where plaintiff firefighters sought continuing health insurance coverage benefits under section 10 of the Act.

¶ 27     The plaintiff in the *Gaffney* case was injured during a training exercise involving a live fire on the third floor of a building. *Id.* ¶ 8. Gaffney's crew responded to the exercise with their engine's lights and sirens activated. *Id.* Gaffney's crew was instructed to advance a hose line to the seat of the fire and to search for victims along the way. *Id.* ¶ 9. The hose became entangled as Gaffney's crew was advancing from the second floor to the third floor, with no visibility, through smoke and obstacles. *Id.* ¶ 8. Gaffney followed the hose back to where it was entangled, in what turned out to be a "loveseat type chair." *Id.* ¶ 6. Gaffney flipped the loveseat backward and injured his shoulder, resulting in a catastrophic injury. *Id.* ¶ 8.

¶ 28     The plaintiff in the case consolidated with Gaffney's case, Lemmenes, also was injured while participating in a training exercise. The training did not involve a live fire, but the firefighters' masks were blacked out to simulate live fire conditions. *Id.* ¶ 23. The firefighters were instructed to advance a hose line into the building along a predetermined path and to rescue a "downed firefighter." *Id.* ¶ 24. Lemmenes was injured while " 'twisting and turning and pulling this [downed firefighter] trying to free him' from an unknown obstacle." *Id.* ¶ 22. Lemmenes also suffered a catastrophic injury as a result of the exercise. *Id.*

¶ 29     Both Gaffney and Lemmenes claimed that they were entitled to continuing health insurance benefits under section 10 of the Act because they each had

suffered catastrophic injuries, and those injuries occurred "in response to what is reasonably believed to be an emergency" as set forth in section 10(b). As in this case, the parties agreed that each plaintiff had suffered a catastrophic injury, and disputed only whether the injuries occurred in response to what was reasonably believed to be an emergency.

¶ 30 In addressing the emergency requirement set forth in section 10(b) of the Act, the *Gaffney* court held:

"the plain and ordinary meaning of the term 'emergency' in section 10(b) is an unforeseen circumstance involving imminent danger to a person or property requiring an urgent response. To be entitled to continuing health coverage benefits under section 10(b), the injury must occur in response to what is reasonably believed to be an unforeseen circumstance involving imminent danger to a person or property requiring an urgent response." *Gaffney*, 2012 IL 110012, ¶ 64.

¶ 31 The *Gaffney* court concluded that Gaffney's belief that he was responding to an emergency during the training exercise was reasonable and fell within the purview of the Act. *Id.* ¶ 69. The court noted that after Gaffney's training exercise began, the hose line became tangled in an unseen object, which was an unforeseen circumstance. *Id.* ¶ 65. Further, the response to that event also was unforeseen, because Gaffney was required to follow the hose line back to the obstruction and free the hose, with no visibility and with the risk of becoming disoriented in the smoke filled building. *Id.* Those unforeseen circumstances involved imminent danger to a person or property requiring an urgent response, because the crew was stranded on the stairwell to the third floor of the burning building with no visibility and no water to put out the fire, given the tangled hose line. *Id.* ¶ 66. The court concluded that in those minutes, when something went wrong in the training exercise, the training exercise turned into an emergency, so that Gaffney's injury fell within section 10(b) of the Act. *Id.* ¶ 67.

¶ 32 In contrast, the *Gaffney* court found the facts in Lemmenes' case did not establish any unforeseen circumstance involving imminent danger to a person or property requiring an urgent response. *Id.* ¶ 77. Lemmenes understood he was participating in a training exercise, which was conducted under planned, controlled conditions. *Id.* The training exercise did not involve a live fire, nor was there any smoke in the structure. *Id.* ¶ 78. No one was in imminent danger during the

exercise. *Id.* No unexpected or unforeseen developments arose during that training exercise. *Id.* ¶ 77. Therefore, the circumstances in Lemmenes' case did not satisfy the requirements of section 10(b). *Id.* ¶ 79.

¶ 33 In reversing the circuit court, the appellate court in this case cited *Gaffney*, as well as the appellate court decisions in *Springborn v. Village of Sugar Grove*, 2013 IL App (2d) 120861, and *Pedersen v. Village of Hoffman Estates*, 2014 IL App (1st) 123402.

¶ 34 S*pringborn* was a consolidated case concerning whether two police officers were responding to emergencies for purposes of section 10(b) of the Act when they suffered catastrophic injuries. Officer Springborn had observed a mass of asphalt chunks on a major highway, so he activated his emergency lights and parked behind the chunks of asphalt in the highway. *Springborn*, 2013 IL App (2d) 120861, ¶¶ 8-10. While clearing the highway of the asphalt chunks, Springborn slipped and injured his back, suffering a catastrophic injury. *Id.* ¶ 10.

¶ 35 Officer Cecala, the officer whose case was consolidated with Springborn's case, was dispatched to investigate a traffic accident and possible case of driving under the influence. *Id.* ¶ 15. Cecala headed to the scene with his emergency lights and siren activated. *Id.* When he arrived on the scene, Cecala observed a traffic signal lying in the road and a truck against a tree at a corner of the intersection. *Id.* Cecala was concerned not only because the pole posed a roadway obstruction, but also because its wires had been pulled out of the ground and were still live. *Id.* Cecala parked his squad car behind the signal pole and activated his emergency lights, as well as his squad car's directional signal. *Id.* ¶ 16. Cecala was catastrophically injured as he was manually moving the pole off the roadway.

¶ 36 The *Springborn* court found that both Officer Springborn and Officer Cecala believed that they were facing emergencies, and that their subjective beliefs about the presence of an emergency were reasonable. *Id.* ¶ 36. The *Springborn* court also found that each situation presented imminent danger, requiring an urgent response, and that the particular circumstances of each event were not foreseeable. *Id.* Accordingly, both officers were entitled to benefits under section 10 of the Act.

¶ 37 In *Pedersen*, the plaintiff firefighter responded to a call regarding a tanker truck on fire on an Illinois toll road. After the fire was extinguished, plaintiff was cleaning the scene and packing equipment. *Pedersen*, 2014 IL App (1st) 123402, ¶ 7. The fire engine remained positioned to protect the firefighters, with its

emergency lights still activated. *Id.* Plaintiff was moving a reflective triangle from the tanker truck, within feet of the fire engine, when the fire engine's siren inadvertently and unexpectedly activated, causing plaintiff to become catastrophically disabled due to hearing loss. *Id.*

¶ 38    The *Pedersen* court found that it was reasonable for the plaintiff to believe the emergency was ongoing and that the scene remained dangerous. *Id.* ¶ 60. Therefore, the plaintiff was injured as a result of an unforeseen circumstance involving imminent danger to a person or property, requiring an urgent response, so that the plaintiff was entitled to benefits under section 10 of the Act. *Id.*

¶ 39    Based upon the preceding cases, the appellate court in this case concluded that plaintiff was entitled to benefits under section 10 of the Act. The appellate court noted that plaintiff was returning to his patrol car in order to answer a call from dispatch when he suffered his work-related injury. The court stated:

"The plaintiff's affidavit indicated that a call from dispatch was one means in which the officers are notified of an emergency. Although we recognize that there was no evidence presented that this dispatch call resulted in an emergency situation, it is an officer's duty to respond to dispatch calls in a timely manner and be prepared for any eventuality. An officer cannot know the nature of the call until he responds. Therefore, until the officer is able to eliminate the possibility that the dispatch call is an emergency, the officer treats the call as if it were such. Like *Springborn*, the circumstances surrounding the plaintiff's injury are no less dire because it fell within the kinds of events that police officers anticipate encountering in their daily duties. The evidence established that the plaintiff was engaged in the act of responding to what he believed was a potential emergency that could have, based on the fact that a radio call from dispatch was a means of communication concerning an emergency situation, involved imminent danger to a person or property and therefore required an urgent response. Accordingly, we conclude that these facts establish that the plaintiff's injury was incurred as a result of his response to what he reasonably believed was an emergency." 2015 IL App (5th) 140122, ¶ 19.

¶ 40    Defendant argues that the appellate court's holding essentially has added a fifth basis for recovery to section 10(b): an injury occurring while responding to any call by a superior, until such time as that call is determined not to be an emergency.

Defendant maintains that the appellate court's reading of the statute improperly expands section 10(b).

¶ 41    Plaintiff responds that he was injured when he was responding to what he reasonably could have believed was an emergency call. Plaintiff states that all actions that he took, which resulted in his injury, were before he had any knowledge of the nature of dispatch's call. Plaintiff asserts that this court should review the facts from his subjective perspective at the time of the call and at the time he made his response, not at a later time.

¶ 42    We agree with defendant that the facts of this case do not fit within the emergency situation set forth in section 10(b). The facts of this case are more analogous to the facts in Lemmenes' case than the facts of Gaffney's case, or the fact situations presented in *Springborn* and *Pedersen*. That a call from dispatch potentially could evolve into an emergency situation for purposes of section 10(b) of the Act does not mean that every call from dispatch is an emergency until proven otherwise. Answering a call from dispatch is not an unforeseen circumstance. No unexpected or unforeseen developments arose while plaintiff was answering the call from dispatch. Moreover, there are no facts establishing any imminent danger to a person or property requiring an urgent response surrounding the call from dispatch. For those reasons, there is no evidence that plaintiff's injury was suffered in response to what was reasonably believed to be an emergency. Accordingly, the circuit court's order denying plaintiff's complaint for injunctive relief was not against the manifest weight of the evidence, as plaintiff was not eligible for insurance coverage under section 10 of the Act.

¶ 43    In so holding, we note that although the appellate court acknowledged that this case arose from the circuit court's denial of plaintiff's complaint for injunctive relief, the appellate court simply cited the black letter law concerning permanent injunctions, and did not otherwise analyze whether plaintiff was entitled to a permanent injunction. The appellate court's order simply held that the facts established that plaintiff's injury was incurred as a result of his response to what he reasonably believed was an emergency. Therefore, the appellate court reversed the judgment of the circuit court and remanded for further proceedings consistent with its decision, presumably finding that plaintiff had established the elements necessary to issue a permanent injunction.

¶ 44 To be entitled to a permanent injunction, a party "must demonstrate (1) a clear and ascertainable right in need of protection, (2) that he or she will suffer irreparable harm if the injunction is not granted, and (3) that no adequate remedy at law exists." *Swigert*, 2012 IL App (4th) 120043, ¶ 27. Because we find that plaintiff's injury did not occur as a result of one of the conditions of section 10(b) of the Act, it follows that plaintiff did not demonstrate a clear and ascertainable right in need of protection, and therefore was not entitled to a permanent injunction. We find that the circuit court correctly denied plaintiff's complaint for injunctive relief, *albeit* for different reasons than those set forth by the circuit court. As a reviewing court, this court can sustain the decision of a lower court on any grounds called for in the record, regardless of whether the lower court relied upon those grounds, or whether the lower court's reasoning was correct. *Leonardi*, 168 Ill. 2d at 97.

¶ 45 In his complaint for injunctive relief, plaintiff also alleged that defendant cannot terminate the payment of plaintiff's section 10 benefits except as set forth in sections 10(a)(2) and (3) of the Act. Those sections provide:

"(2) It is unlawful for a person to willfully and knowingly make, or cause to be made, or to assist, conspire with, or urge another to make, or cause to be made, any false, fraudulent, or misleading oral or written statement to obtain health insurance coverage as provided under this Section. A violation of this item is a Class A misdemeanor.

(3) Upon conviction for a violation described in item (2), a law enforcement, correctional or correctional probation officer, or other beneficiary who receives or seeks to receive health insurance benefits under this Section shall forfeit the right to receive health insurance benefits and shall reimburse the employer for all benefits paid due to the fraud or other prohibited activity." 820 ILCS 320/10(a)(2), (3) (West 2012).

¶ 46 Plaintiff maintains that the provisions of section 10 set forth the sole basis for termination of section 10 benefits. Plaintiff argues that because he has not been convicted of any charge or allegation as set forth in section 10, his benefits, having been provided, cannot now be terminated.

¶ 47 As the court noted in *Gaffney*, the Act does not provide any guidance on the proper procedure for seeking section 10 benefits. *Gaffney*, 2012 IL 110012, ¶ 44. The statute "only mandates that an employer shall provide the benefits *if the specified requirements are met*." (Emphasis added.) *Id.* Those requirements are that

- 12 -

the party seeking benefits suffered a catastrophic injury and that the injury or death occurred in one of the four situations specified in section 10(b). Section 10 expressly states that, "[i]n order *** to be eligible for insurance coverage under this Act, the injury or death *must have occurred as the result of *** the officer or firefighter's response to what is reasonably believed to be an emergency.*" (Emphasis added.) 820 ILCS 320/10(b) (West 2012). Here, plaintiff's injury did not occur as the result of a response to what was reasonably believed to be an emergency. Consequently, plaintiff was not eligible for insurance benefits under section 10 of the Act in the first place. Defendant, therefore, was not statutorily mandated to provide those benefits, and was not prohibited from terminating payment of those benefits.

¶ 48 Finally, plaintiff argues that defendant is equitably estopped from terminating plaintiff's health insurance benefits under section 10. Equitable estoppel may apply against municipalities in extraordinary and compelling circumstances. *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 35. In order to apply equitable estoppel against a municipality, a plaintiff "must plead specific facts that show (1) an affirmative act by either the municipality itself or an official with express authority to bind the municipality; and (2) reasonable reliance upon that act by the plaintiff that induces the plaintiff to detrimentally change its position." *Id.* ¶ 40. The usual elements of estoppel are further supplemented with the additional restriction that a public body will be estopped only when necessary to prevent fraud or injustice, particularly when public revenues are involved. *Rockford Life Insurance Co. v. Department of Revenue*, 112 Ill. 2d 174, 185-86 (1986).

¶ 49 Plaintiff asserts that defendant's provision of health insurance to plaintiff, without objection, was an affirmative act. Moreover, plaintiff states that he reasonably relied upon defendant's provision of health insurance benefits, which induced him to detrimentally change his position and drop the health insurance he had at the time. Plaintiff maintains that defendant is thereby equitably estopped from now terminating plaintiff's health insurance.

¶ 50 We disagree with plaintiff that he detrimentally changed his position when he dropped his health insurance in reasonable reliance on defendant's provision of health insurance benefits. The fact that defendant will no longer pay the entire premium of its health insurance plan for plaintiff and his family does not prevent plaintiff from continuing his health insurance coverage under COBRA, or from obtaining his own health insurance pursuant to the Patient Protection and

Affordable Care Act (42 U.S.C. § 18001 *et seq.* (2012)). The fact that plaintiff now will have to pay some or all of his health insurance premiums does not constitute a detrimental change in position for purposes of equitable estoppel, let alone rise to the level of fraud or injustice. Considerations of equitable estoppel do not bar defendant from terminating plaintiff's section 10 health insurance benefit.

¶ 51    We therefore reverse the appellate court's decision, which reversed the circuit court's order denying plaintiff's complaint for injunctive relief. We find that plaintiff was not entitled to a permanent injunction, and, for the reasons set forth herein, affirm the circuit court's order denying plaintiff's complaint for injunctive relief.

¶ 52    Appellate court judgment reversed.

¶ 53    Circuit court judgment affirmed.